Argued January 3, affirmed as modified and remanded
September 21, petition for rehearing denied
October 12, 1967

# OREGON STATE PHARMACEUTICAL ASSO-
CIATION ET AL, *Appellants and Cross-re-
spondents, v.* STATE PUBLIC WEL-
FARE COMMISSION, *Respondents
and Cross-appellants.*

432 P. 2d 296

*William B. Wyllie,* Salem, argued the cause for appellants and cross-respondents. With him on the briefs were Rhoten, Rhoten & Speerstra.

*A. Duane Pinkerton,* Assistant Attorney General, Salem, argued the cause for respondents and cross-appellants. With him on the briefs were Robert Y. Thornton, Attorney General, and Louis S. Bonney, Assistant Attorney General.

Before McAllister, Presiding Justice, and Sloan, O'Connell, Goodwin, Denecke, Holman and Lusk, Justices.

LUSK, J.

This is a representative suit brought on behalf of proprietors of drug stores and pharmacists, members of the plaintiff, Oregon State Pharmaceutical

Association, to obtain a declaration that they are entitled to recover from the defendant State Public Welfare Commission the agreed and reasonable value of drugs furnished by them to eligible recipients of public assistance at the request of the Commission. From a decree granting plaintiffs (hereinafter referred to *passim* as druggists) partial relief both sides have appealed.

Medical assistance under the Public Welfare Law includes the furnishing of "prescribed drugs" to eligible individuals: ORS 414.025 (12), and it is the duty of the Commission to render such assistance "within the limits of funds available therefor": ORS 414.065 (1).

Pursuant to such statutory duty the Commission on June 29, 1961, adopted and promulgated Administrative Order PWC 468. This order, known as the Drug Guide, was adopted after extensive negotiations between representatives of the Pharmaceutical Association, the Oregon Medical Society, and members of the Medical Division of the State Public Welfare Commission. It contains detailed instructions regarding the operation of the Drug Welfare Program. For present purposes it is sufficient to say that drugs are dispensed on prescription of a duly licensed physician or surgeon to persons having a requisition therefor from the county public welfare office. No cash is paid and the Commission, upon being billed by the druggist at the end of the month, pays him the purchase price, which is an established maximum price set forth in the Drug Guide. The Drug Guide states:

> "Prices in this schedule are ceiling prices. Where prevailing prices in a community for a particular item are lower than the price here listed, it is understood that the pharmacist will adjust his

charge to State Public Welfare Commission to give the full benefit of such lower prices. Prices in this schedule are subject to change."

The Guide was printed and a copy sent to each registered pharmacist in the state. It is not disputed that the prices indicated in the Drug Guide are less than would be charged to the ordinary customer.

This controversy, however, does not involve the reasonableness of the prices, but arises out of the refusal of the Commission to pay the established prices in full. That came about in this way.

Prior to the fiscal year commencing July 1, 1963, the Commission adopted its so-called "Annual Allotment Plan", which called for a monthly expenditure of $42,028 for drugs during that fiscal year. (For fiscal year 1964-1965, the monthly allotment was $43,723.) It developed, however, that the billings for drugs were exceeding the monthly allotments and for the first four months of the fiscal year the overexpenditure was in excess of $47,000. To meet this "crisis," as it is referred to in the testimony, the Commission put into effect in November, 1963, a pro rata system under which it continued to authorize the dispensing of drugs beyond its ability to pay for them in full under the Allotment Plan, and during the biennium 1963-1965, up to the time of the commencement of this suit, paid the druggists only that percentage of their charges which the "funds available" bore to the total billings for a particular month. What the Commission considered the "funds available," as well as our own views on that subject, will be hereinafter explained.

■ Plaintiffs contend that the Commission acted without authority of law in prorating drug payments in this manner, and is liable to them for moneys so

withheld. Whether the Commission had such authority is the pivotal question in the case, but before considering it, we will notice a contention of the defendant that this suit is in effect one against the state and has not been authorized by statute. Plaintiffs answer that the suit is upon a contract and is authorized by ORS 30.320, which provides:

> "A suit or action may be maintained  *  *  * against the State of Oregon by and through and in the name of the appropriate state agency upon a contract  *  *  * made by such agency and within the scope of its authority, and not otherwise; *  *  *."

The Commission argues:

> "*  *  * [T]he existence of a contract has not been established. The duty to provide public assistance is purely statutory and not contractual. This duty is imposed by statute in each of the several public assistance programs, and in each program the duty is limited to the extent of available funds. (Citing several sections of the Public Assistance Law.)"

The duty to provide public assistance is imposed by statute on the State Public Welfare Commission, not on the druggists of Oregon. No statute could validly impose upon druggists any burden of furnishing public assistance beyond the burden, common to the citizenry in general, of paying through taxation their proportionate share of the cost of the program. And no statute attempts to do so. It may be, as observed, *obiter,* by Mr. Justice Douglas concurring in *Reitman v. Mulkey,* 387 US 369, 386, 87 S Ct 1627, 1636, 18 L ed 2d 830, 840, that drug stores, like telephone companies, are "affected with a public interest in the historic and classical sense," but even telephone companies are con-

stitutionally entitled to a reasonable return on their investment.

■■ We think it clear that, as the trial judge held, we are dealing here with a unilateral contract, or, to be more exact, a series of such contracts. The Commission, through the Drug Guide, made a continuing offer to the druggists to pay them stipulated prices for drugs dispensed to eligible recipients of public assistance and each and every such transaction carried out by the druggists in accordance with the regulations in the Drug Guide constituted acceptance of the offer and an executed contract supported by a valuable consideration. The offer could be withdrawn at any time as to future transactions and the question whether it was validly withdrawn and a new offer made and accepted is to be determined by what was done and by a construction of certain statutes governing expenditures by the Commission from appropriated funds. We proceed to an examination of these statutes.

Expenditures of appropriations and funds by state officers and agencies are subject to the so-called allotment system delineated in ORS 291.234 to 291.260. Material provisions of the statute are set forth in the margin.①

---

① ORS 291.232: "It is declared to be the policy and intent of the Legislative Assembly that the total appropriations made by it, or the total of any budget approved by it, for any state agency, shall be deemed to be the maximum amount necessary to meet the requirements of such agency for the biennium, excepting as may otherwise be provided by law, and that the Governor and the Department of Finance and Administration are given the powers granted by ORS 291.202 to 291.222 and 291.232 to 291.260 in order that savings may be effected by careful supervision throughout each biennium, with due regard to changing conditions, and by promoting more economic and efficient management of state agencies."

ORS 291.234: "(1) The Department of Finance and Adminis-

tration shall make allotments to state officers and agencies of appropriations and funds pursuant to the allotment system provided for in ORS 291.234 to 291.260.

"(2) For the purposes of the allotment system, each fiscal year shall be divided into four quarterly allotment periods, beginning, respectively, on the first days of July, October, January and April. However, in any case where the quarterly allotment period is impracticable, the department may prescribe a different period suited to the circumstances, not exceeding six months nor extending beyond the end of the biennium."

ORS 291.238 (1): "Except as expressly authorized in this section or ORS 291.236, no person shall incur, or order or vote to incur, any obligation against the state in excess of, or make or order or vote to make any expenditure not authorized by, an allotment. Any such obligation so incurred shall not be binding against the state, but where the obligation violates this section only for having been made in excess of an allotment, the department may authorize payment thereof from unalloted funds."

ORS 291.242 provides that no appropriation shall become available to any state agency for expenditures thereby during any allotment period until an estimate for such allotment period submitted by the agency is approved, increased or decreased by the department and funds allotted therefor.

ORS 291.246: "Allotments shall be made according to purpose and classification of expenditures prescribed in the appropriation measure as enacted by the Legislative Assembly; provided, however, that the Department of Finance and Administration may make allotments for agencies by purposes or by other classification of expenditures of amounts appropriated or authorized to be expended in appropriation measures enacted by the Legislative Assembly, whether or not such measures establish classification of expenditures. In making allotments, the Department of Finance and Administration shall not authorize the expenditure of moneys for any purpose not authorized by the Act appropriating the money or authorizing it to be expended, and the funds allotted for each purpose or classification of expenditure shall be used for no other purpose or classification of expenditure."

ORS 291.250: "The agency shall not create any claim or encumbrance for the future disbursement of appropriated moneys unless the proposed expenditure as estimated, together with expenses theretofore paid from or encumbered against such allotment, is within the total amount and for the purposes specified in the notice of allotment transmitted to such agency."

ORS 291.252: "The department may at any time modify or amend any allotment previously made by it, upon application of, or upon notice to, the agency concerned, but no such modification or amendment shall reduce an allotment below the amount required to meet valid obligations or commitments previously incurred against the allotted funds."

In substance it is provided that a state agency is limited in its expenditures of appropriated moneys during a particular period to a sum estimated by the agency as the allotment for that period and approved by the Department of Finance and Administration. By ORS 291.238 the incurring of an obligation or the making of an expenditure in excess of, or not authorized by, an allotment is prohibited, and an obligation so incurred shall not be binding against the state, though, where the obligation violates the section only because it is in excess of an allotment, the Department may authorize payments thereof from unallotted funds. The allotment system is expressly made applicable to the administration of the Public Assistance Law by ORS 411.120.[2]

In addition the Public Assistance Law contains a built-in allotment system. By ORS 411.130[3] the Com-

---

[2] ORS 411.120: "The state commission may, subject to the allotment system provided for in ORS 291.234 to 291.260, expend such sums as are required to be expended in the various counties of this state to provide public assistance. Expenditures for public assistance include, but are not limited to, expenditures for the following purposes:  *  *  *"

The purposes enumerated are:
  1. Assistance to needy persons;
  2. Old-age assistance;
  3. Medical assistance for the aged;
  4. Assistance to needy blind persons;
  5. Assistance to dependent children;
  6. Assistance to the permanently and totally disabled;
  7. Medical assistance;
  8. Carrying out the provisions of law for child welfare purposes;
  9. Such purposes as the state commission is otherwise authorized to expend funds [for], including administration expenses.

[3] ORS 411.130: "The state commission, taking into consideration the total amount of funds available for public assistance in Oregon during the biennial period beginning July 1 of each odd-numbered year, the estimated number of beneficiaries in each category thereof, current and estimated costs of essential needs to

mission is required to "estimate and allocate the funds available for each category of public assistance on a monthly basis subject to the quarterly revisions" and "[t]he monthly amounts so * * * allocated shall be deemed to be the funds available for each category for public assistance in Oregon."

■ The druggists in contracting with the Commission were, of course, charged with knowledge of the law and bound by its terms. No judgment could be rendered against the Commission for the payment of obligations in excess of an allotment duly made pursuant to statutory authority. Plaintiffs, while seeming to concede that the allotment statute—ORS 291.234 to 291.260—is applicable, argue, nevertheless, that the allotments must be limited to the nine "categories" of public assistance listed in ORS 411.120 and that so-called "object" classifications, such as for drugs, one of numerous items included in medical assistance, ORS 414.025, are unauthorized. That might be so if the provisions of sections 291.234 to 291.260 were not fully applicable. We think they are.

Administration of the Public Assistance Law was not expressly made subject to the general allotment statute until 1961. Under date of December 7, 1960, the Attorney General rendered an opinion to the effect that the Public Assistance Fund established by ORS

maintain a standard of living during such period compatible with decency and health and such other matters as it may deem pertinent, shall estimate and allocate the funds available for each category of public assistance on a monthly basis subject to the quarterly revisions. Changes in such allocations, if any, shall be uniform and, as nearly as practicable and considering the above factors, proportionately equal in each such category. The monthly amounts so found estimated and allocated shall be deemed to be the funds available for each category for public assistance in Oregon."

411.240, as it then read, was a "dedicated fund" as defined in ORS 291.002 (3)④ and, as such, subject to control by the Department of Finance and Administration only as to administrative expenditures as provided in ORS 291.238 (2)⑤ (Opinions of Attorney General, 1960-1962, p 95).

Evidently in response to the Attorney General's opinion, certain amendments were adopted by the 1961 Legislative Assembly, Oregon Laws 1961, Chapter 600. Section 2 of this Act provided:

> "The Public Assistance Fund, created by ORS 411.240, hereby is abolished; and, all moneys in the Public Assistance Fund shall be transferred and credited to the Public Welfare Account in the General Fund of the State Treasury."

Theretofore the first sentence of ORS 411.120 read:

> "The State Commission may expend from the money in the Public Assistance Fund in the State Treasury such sums as are required to be expended in the various counties of this state to provide public assistance."

By Section 4 of the 1961 Act this provision was amended so as to include the language, now found in it, "subject to the allotment system provided for in ORS 291.234 to 291.260", and by deleting the language

---

④ ORS 291.002 (3): " 'Dedicated fund' means any fund in the State Treasury, or separate account in the State General Fund in the State Treasury, that by law is dedicated, appropriated or set aside for a limited object or purpose; but 'dedicated fund' does not include a revolving fund or a trust fund."

⑤ ORS 291.238 (2): "Excepting as to administrative expenditures from dedicated, revolving and trust funds and to revolving funds established to provide services rendered by any state agency to other state agencies or to any body politic of the State of Oregon, expenditures from dedicated funds, revolving funds and trust funds may be made by any state agency without appropriation or allotment."

"from the money in the Public Assistance Fund in the State Treasury."

We think it was the intention of the Legislative Assembly in adopting the 1961 amendments, not only to strip the appropriation for public assistance of its character as a dedicated fund, but, by the express language of Section 4 of the 1961 Act, to make the provisions of the allotment system fully applicable to the budgeting and expenditure of moneys appropriated for public assistance purposes. Both the Department of Finance and Administration and the Commission have acted in accordance with this interpretation.[9]

While it may be correct to say that under the Public Assistance statute's built-in allotment system, allotments on a monthly basis are limited by the categories of public assistance listed in ORS 411.120, this is not true of the general allotment system. ORS 291.246 provides that the Department of Finance and Administration "may make allotments for agencies *by purposes or by other classification of expenditures* of amounts appropriated or authorized to be expended in appropriation measures enacted by the Legislative Assembly, whether or not such measures establish classification of expenditures." (Italics added.)

In accordance with the provisions of ORS 291.242 the Commission submitted to the Department its esti-

___

[9] It should be noted that in 1965 ORS 411.240 (1) was again amended by adding: "The moneys in the Public Welfare Account and all appropriations for the State Public Welfare Commission shall be subject to allotment made by the Department of Finance and Administration": Oregon Laws 1965, Chapter 440, Section 3. This amendment was not in force during the period covered by this case, but as its purpose had already been accomplished by the previous legislation, it must be concluded that the amendment was adopted only to remove any lingering doubt there have been upon the subject. See Opinions of Attorney General, 1962-1964, p 409.

mate of the amount required monthly for the purchase of drugs during the biennium (as well as for its other activities) and the Department approved the estimate, whereupon the amounts so approved became the appropriation "available" to the Commission during the allotment periods.

■ Before putting the pro rata method of paying drug bills into effect the Commission gave notice to the druggists of its intention to do so.

On October 8, 1963, the Commission sent to all the druggists in the state a communication entitled "IMPORTANT NOTICE," which stated, in substance, that if a tax measure to be voted on at the special election on October 15, 1963, should be rejected by the voters this would mean a heavy reduction in the public welfare budget and in allowances to needy persons for food, shelter and other essentials and that

"drug billings each month will be subject to pro rata payment if the funds available will not meet the total billed. Pro rata payments for hospital care and physician services have been in effect since July, 1960 and in order to contain expenditures within the prescribed limits, extension of the prorate mechanism to drugs is unavoidable at this time.

"Payments made on or after November 1, 1963 will be made in accordance with the reduced funds available regardless of the date goods or services were provided."

The next payments for drugs after the notice of October 8, 1963, were made on November 14, 1963, and the checks were accompanied by a notice reading in part as follows:

"TO ALL PHARMACIES: The enclosed payment has been pro-

rated at 65.36% in accordance with our notice dated October 8, 1963.

"Funds allotted for drug payments *were not* reduced as a result of the tax referendum. However, billings included in the payment amounted to $64,293.93, towards which an allotment in the amount of $42,028.00 was available. The amount billed this month is over $5,000 greater than any month previously. This is due to many bills submitted for drugs provided as much as six months ago. The result is that the prorate this month is exceptionally low."

■ These communications constituted a modification of the previous offer to pay the prices stipulated in the Drug Guide. The druggists, collectively or individually, were free to accept or reject the Commission's proposal. This may well have been in the nature of a Hobson's choice—any druggist with a decent respect to the opinion of the community might hesitate in the circumstances to refuse continued participation in the humanitarian program of providing medical assistance to the indigent.⑦ Nevertheless, the druggists' legal position was clear and when they thereafter, without any protest whatever, so far as the record discloses, furnished drugs to welfare recipients with full knowledge of the new terms of payment they must be held to have accepted those terms.

■ The plaintiffs contend, however, that since the notice of October 8, 1963, stated that after November 1,

---

⑦ The trial judge stated in his decision:

"* * * prorating payments for drugs placed a burden upon the pharmacists to choose between accepting less than a reasonable price as payment for their sales and of refusing to serve a person in need. Either alternative would be distasteful to most vendors."

1963, payments would be made "in accordance with the reduced funds available," and the trial court found on competent evidence that "the Commission expected to turn back to the General Fund well in excess of one million dollars at the end of the biennium on June 20, 1965," and "[t]here was a substantial amount of money remaining available in the drug program itself all during the period from November 1, 1963, to time of trial [May, 1965]," the condition under which the Commission claimed the right to prorate never arose. It is said, therefore, that funds were available to pay the plaintiffs in full and that the Commission "was required to utilize its entire appropriation for its requirements." To support this argument a portion of ORS 291.232, which is the Legislative Assembly's declaration of policy of the allotment system statute, is cited and quoted (albeit inaccurately) in plaintiffs' brief, as follows:

> " '* * * the policy and intent of the Legislative Assembly that the *total appropriation* made by it * * * for any state agency shall be sufficient to meet the requirements of such agency for the biennium, excepting as may be otherwise provided by law * * *.' (Emphasis added)"

In fact, the statute provides that the total appropriations for any state agency "shall be deemed to be the *maximum* amount necessary to meet the requirements of such agency for the biennium" (italics added), and goes on to recite "that the Governor and the Department of Finance and Administration are given the powers granted by ORS 291.202 to 291.222 and 291.232 to 291.260 in order that savings may be effected by careful supervision throughout each biennium, with due regard to changing conditions, and by promoting

more economic and efficient management of state agencies."

It should first be observed that the appropriation for the 1963-1965 biennium contained no line appropriation for drugs or any other specific item of public assistance, but a lump sum appropriation of $26,473,029 for "Assistance payments and related expenses": Oregon Laws 1963, Chapter 537.

Instead of imposing a requirement that the Commission or any other state agency subject to the allotment system utilize its appropriation in full, the system was obviously adopted for the purpose of effecting economies in the expenditure of appropriated moneys. The appropriation was intended to be the maximum and it was the evident legislative purpose that wherever feasible the expenditure should be less than the appropriation. The control of budgets given to the Department of Finance and Administration was a means adopted to further that purpose. The allotment for each of the various items became the amount available to the agency except as it might be later changed by the Department, ORS 291.252, and any expenditure in excess of an allotment was prohibited, ORS 291.238. The following testimony of Mr. Leo Hegstrom, Assistant Administrator of the Commission for business service, correctly sums up both the law and its practical operation:

"The appropriation of funds to the State Public Welfare Commission by the Legislature does not make the funds available to the State Commission. They are available only insofar as an approved allotment plan is filed with the Department of Finance for approval, passed upon quarterly."

It is true that the Commission estimated there would be a reversion of $1,897,297 to the General

Fund, but there the evidence stops. There is nothing to indicate that this money ever had been allotted for any purpose and therefore no evidence that it was available to the Commission.

██ Another aspect of this question remains to be considered. It arises out of what we deem to be the error of the Commission in determining the "available funds" constituting the base for computing the amounts of the pro rata payments. After November 1, 1963, as we have held, drugs were sold pursuant to an offer of the Commission, accepted by the druggists, to make only pro rata payments. The offer had to do only with drugs sold after November 1, 1963, and to drugs sold before that date the bills for which came in subsequent to November 1.

The modified agreement also contemplated that all available funds would be applied to payment of the drug bills. The Commission's notice to the druggists dated October 8, 1963, stated that payments would be made after November 1, 1963, "in accordance with the reduced funds available regardless of the date goods or services were provided." In the notice to the druggists dated November 14, 1963, the Commission stated that billings included in the pro rata payment made at that time amounted to $64,293.93 "towards which an allotment in the amount of $42,028.00 was available."

By these communications the druggists were informed that the Commission intended to prorate payments for drugs only when funds were not available to pay the list price in full and then only to the extent made necessary by such nonavailability. The Commission, however, used the pro rata system to recover

from the druggists the payments to them in excess of the allotments during the first four months of the biennium and in the course of doing so treated as unavailable for the payment of the druggists' current bills funds which in fact and law were available.

The method adopted for recovering the excess payments was explained by Mr. Hegstrom. He identified plaintiffs' Exhibit 10, a "Schedule of Billings Processed by Month November 1963 to April 30, 1965," which had been prepared for use at the trial. The exhibit shows in parallel columns for each of the months covered "Drug Bills Processed," "Funds Available," and "Prorate Percentage." For November 1963 the respective amounts are $64,293.93, $42,028 and 65.36%. For December 1963 they are $55,779.57, $39,995 and 71.52%. Apparently similar reductions in "Funds Available," to wit, the monthly allotment, were made until June 1964. Mr. Hegstrom testified:

"Q * * * You had available, according to Exhibit 10, $42,028 for the month of November, 1963. I gather that was a uniform amount, budgeted or something, for all the months. Is that correct?

"A That's right.

"Q The next month, you still had budgeted $42,000 but you say here funds available were only $39,955. Was that a shortage in some other month?

"A In November, you recall Mr. Juras' testimony, it was determined by the Commission that the overexpenditure in the first four months would be recovered through the prorate of the remaining nineteen months.

"Q I see.

"A So starting in December, the allotment of $42,028 was reduced by some $2,000 and some plus dollars.

"Q So these reductions were at the discretion of the Commission or its staff?

"A The reduction to recover the overexpenditures was at the discretion of the Commission. * * *"

ORS 291.252, set out in full in Footnote 1, supra, authorizes the Department of Finance and Administration to amend or modify an allotment previously made by it upon application of or notice to the agency concerned, but forbids reduction of an allotment below the amount required to meet valid obligations or commitments previously incurred against the allotted funds. There is no evidence that the Department ever amended or modified the drug allotments and we find no statute vesting authority in the Commission to reduce an allotment. We assume, of course, that the Commission could spend less in any period than the amount alloted for that period, but, as we understand it, this is not what was done. Instead, the Commission month by month incurred bills in excess of the allotment and in the exercise of a claimed discretion reduced the allotment in order, as Mr. Hegstrom testified, "to recover the overexpenditures." But the amounts allotted and approved by the Department constituted the moneys available for the payment of drug bills. This is conceded as a general proposition by the Commission in its brief. As we read the statute, the Commission exceeded its authority in reducing the allotments. In point of law the allotments remained as originally established, and during the fiscal year 1963-1964 the monthly basis upon which the prorate should have been computed was $42,028 and not a lesser sum, and in fiscal year 1964-1965 it was $43,723. The druggists, therefore, are entitled to recover the

deficiency in payment to them that resulted from the attempted reduction of the monthly allotments. As the record leaves uncertain the amount of such deficiency that matter may be determined on the remand.

The circuit court held, as we do, that the druggists accepted the modified terms under which payments were prorated after November 1, 1963, and were, therefore, not entitled to payment in full, but granted no relief to the druggists because of the unauthorized reduction in the drug allotments above described. The court, however, held that the druggists were entitled to payment in full for drugs delivered to welfare recipients prior to November 1, 1963.

■ It is from that part of the decree that the Commission has appealed. Strictly, there is no issue in the pleadings regarding drugs sold prior to November 1, 1963, but, as the Commission has not raised that question, we will state briefly our views upon this branch of the case. The trial judge reasoned in well prepared findings of fact and conclusions of law that, since the Commission's announcement of its pro rata policy was not made until after the drug bills for the first four months of the biennium had been incurred, the druggists did not agree to accept pro rata payments for those sales. In this we concur. The trial judge next held that there were funds available to pay those bills in full. With this conclusion, evidently based upon a different view than ours of the effect of the allotment system statute, we are compelled to disagree. Indeed, if, as the trial judge indicated, the sum of nearly two million dollars, which the Commission estimated would be turned back to the State General Fund, was available for the payment of drug bills incurred before November 1, 1963, it would have

likewise been available for such bills incurred after that date, and there would have been no justification whatever for prorating.

It is argued that the Commission should have reduced purchases of drugs after November 1, 1963, in order that it might be able to pay for them in full. This is surely not a judicial question. The Commission had estimated on the basis of past experience the drug requirements of people entitled to public assistance benefits during the biennium, and the amount of money needed for that program. When the demand for drugs became greater than had been anticipated it was for the Commission and not a court to decide whether or not to curtail the supply. Plaintiffs say that to thus continue the purchase of drugs at the same level as before and prorate payments to the druggists was contrary to the theory of the allotment system and to various provisions of the public assistance statute which limit the Commission in providing goods and services to "the extent of such need and the availability of funds": ORS 411.010 (5). And, it is suggested that to sanction a prorating plan would make it possible for the Commission to purchase items for which it had no funds whatever, budgeted or allotted. Such a situation could not arise except in the scarcely conceivable case of a commission completely devoid of a sense of responsibility. We are not dealing with that kind of a case. The Commission has obviously endeavored in good faith to carry out the commands of the statute. Estimates of the kind here involved are necessarily lacking in accuracy, for the amount of aid which may be required can never be known in advance with certainty. For several years now doctors and hospitals have, by agreement with the Commission, accepted pro rata payment of their

charges for services rendered to beneficiaries of the Public Assistance Law. There does not seem to have been any difficulty about applying the allotment system to these expenditures. We see none in the case of druggists.

■ Two other contentions of the plaintiffs remain to be considered. It is said that the drug pro rata program never became effective because the Commission did not comply with the Administrative Procedure Act, ORS 183.010 to 183.510. Notice, it is urged, should have been given to interested parties of intended action and an opportunity afforded them to be heard and a concise general statement of the basis and purpose of the rule should have been adopted, as required by ORS 183.330.

The Commission receives federal granted funds and claims that it is not subject to the Administrative Procedure Act because of the language of ORS 183.320 making the act inapplicable "to any agency of this state whose law or administrative practices and procedures adopted pursuant thereto are required to conform to any provision of the federal law or rules and regulations as a condition to the receipt of federal granted funds * * *." For a discussion of the interpretation of ORS 183.320, see Franzke and May, The Oregon Administrative Procedure Act, 1 Will L J 233, 236-237, and Hazard, The Oregon Administrative Procedure Act: Status and Prospects, 39 Or L Rev 97, 108-109.

We need not decide the question in this case, for we think that, even though the Commission was required to give notice, hold a hearing and so forth, before making a decision such as that involved in the prorating of drug payments, its failure to do those things

in no way prejudiced the plaintiffs. As the only interested parties, apart from the recipients of public assistance and the general public, plaintiffs were fully aware of the circumstances and the decision. They were at liberty to take whatever action they saw fit. They might, as we have seen, have discontinued dispensing drugs to public assistance recipients. Their position is not to be compared, for example, with that of a person who had been deprived of a license without a hearing. The alleged delinquency could not possibly give rise to a cause of suit in the plaintiffs which otherwise they would not have.

■ Finally, it is contended that prorating their charges deprives the plaintiffs of the equal protection of the laws because the Commission's policy of prorating has been confined to physicians, hospitals, and druggists, while others, those, for example, who sell groceries or rent houses to public assistance recipients, are paid in full. If we were dealing here with a legislative act or an administrative order issued pursuant to law purporting to require druggists to dispense their wares to certain individuals and to accept payment on a pro rata basis, while exempting others from such a requirement, there might be merit in this contention. This is not that kind of a case and we think that no question of equal protection is involved.

In the prayer of the second amended complaint plaintiffs ask that the Commission be enjoined from prorating payments to vendors of drugs. An injunction was properly denied by the circuit court.

A decree will be entered here declaring that the plaintiffs are entitled to recover from the defendants additional pro rata payments for drugs delivered after November 1, 1963, in an amount measured by the un-

authorized reductions in the drug allotments made by the Commission commencing in the month of December, 1963, but, otherwise, they are not entitled to any relief prayed for in the complaint.

The decree of the circuit court is affirmed as here modified, and the cause is remanded to the circuit court where the plaintiffs, if they so desire, may apply to the court for further relief in conformity with this opinion. No costs or disbursements will be allowed.