No. 45        October 3, 2013        253

## IN THE SUPREME COURT OF THE STATE OF OREGON

HOMESTYLE DIRECT, LLC,
*Respondent on Review*,

*v.*

DEPARTMENT OF HUMAN SERVICES,
*Petitioner on Review.*

(DHS 20091957; CA A145136; SC S059874)

En Banc

On review from the Court of Appeals.*

Argued and submitted September 21, 2012; resubmitted January 7, 2013.

Cecil A. Reniche-Smith, Assistant Attorney General, Salem, argued the cause and filed the brief for petitioner on review. With her on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Samuel E. Sears of Larimer & Sears, Salem, argued the cause and filed the brief for respondent on review.

LANDAU, J.

The decision of the Court of Appeals is reversed. The final order of the Department of Human Services is affirmed.

_____

* Judicial review of the final order of the Oregon Department of Human Services.  245 Or App 598, 263 P3d 1118 (2011).

**LANDAU, J.**

This is a contested-case proceeding in which the Department of Human Services (department or DHS) revoked a contractor's eligibility to provide home delivered meals to Medicaid clients because the contractor breached its contract with the department by failing to comply with certain food preparation and delivery standards. The contractor, Homestyle Direct, objected to the revocation, arguing that the standards in the contract are not enforceable because they should have been promulgated as administrative rules. The department rejected those arguments, concluding that whether the standards could have been promulgated as administrative rules is irrelevant to their enforceability as terms of a contract. The Court of Appeals reversed on the ground that, notwithstanding this court's decision in *Coats v. ODOT*, 334 Or 587, 54 P3d 610 (2002), the department cannot enforce unpromulgated rules as terms of a contract. For the reasons that follow, we reverse the decision of the Court of Appeals and affirm the final order of the department.

## I.   BACKGROUND

A.   *The Home Delivered Meals Program*

Title XIX of the Social Security Act, 42 USC § 1396 *et seq.*, authorizes federal grants to states for medical assistance, known as Medicaid, to low-income persons who are age 65 or older, disabled, or members of families with dependent children. *See* 42 CFR § 430.0. Within a broad set of federal rules, states decide "eligible groups, types and ranges of services, payment levels for services, and administrative and operating procedures." *Id.* A participating state is required to submit a plan to the federal government "describing the nature and scope of its Medicaid program and giving assurances that it will be administered in conformity with" federal law. 42 CFR § 430.10. The states may contract with providers to furnish services under its Medicaid program. *See* 42 CFR 431.107(b). Such agreements must include commitments by the providers to keep adequate records, make certain disclosures, and comply with other standards. *Id.*

DHS administers such a Medicaid program. The program includes, among other things, a Home Delivered

Meals (HDM) Program, which provides meals to disabled homebound individuals as a subsidized benefit under the Medicaid program. DHS contracts with nongovernment agency providers to prepare and deliver the meals, which DHS reimburses directly for their services. To qualify as an HDM provider, an individual or organization must meet applicable regulatory and licensing standards. *See* OAR 410-120-1260(5) (2008).[1] Providers must submit an application to DHS for agency approval and must sign a "Provider Agreement" form to obtain reimbursement for their services. The signed form "constitutes agreement * * * to comply with all applicable * * * Provider rules and federal and state laws and regulations." OAR 410-120-1260(2). On completion of the application and execution of the Provider Agreement, the department issues a "provider number" to the applicant. OAR 410-120-1260(7). Issuance of the provider number "establishes enrollment of an individual or organization as a Provider for the specific category(ies) of services covered by the * * * application." OAR 410-120-1260(9).

Under the applicable administrative rules, the provider may terminate enrollment in the service program at any time. OAR 410-120-1260(15)(a). The department is also authorized to terminate or suspend a provider from enrollment in the program for, among other reasons, "[b]reaches of [the p]rovider agreement." OAR 410-120-1260(15)(b)(A). When the department determines that a provider has failed to meet the requirements of the agreement, it is authorized to suspend the provider number immediately. OAR 410-120-1260(16). The provider then is entitled to a contested case hearing to determine whether the provider number should be revoked. *Id*.

B.   *Facts*

The relevant facts are not in dispute. Homestyle is an Idaho corporation that prepares frozen meals. In 2005, it applied for and obtained a provider number authorizing it to provide home-delivered meals to Medicaid recipients

---

[1] OAR 410-120-1260 has since been amended. Those amendments, however, are not relevant to the disposition of this case. All references to the administrative rules in this opinion are to those rules in effect at the time of the events in this case.

in Oregon. Homestyle prepared frozen meals and shipped them to Medicaid clients once or twice each month by United Parcel Service. The department then reimbursed Homestyle for the meals using Medicaid funds.

In October 2008, the department adopted new standards governing the HDM program. Among other things, the new HDM standards impose "[n]utrition [p]rovider [b]asic [r]equirements." Those include a requirement that "[n]utrition providers must be able to provide at least one hot meal or other appropriate meal at least once a day, five or more days per week." If the provider believes that delivering five or more hot meals each week is not feasible, the providers "must provide a written request to the State agency for approval of a lesser frequency of meal service." The meal provider is further required to "develop procedures for regularly (does not have to be daily) taking and documenting meal temperatures of the last meal served on each route." The new HDM standards note that the state health code requires a hot temperature of at least 140 degrees Fahrenheit.

In November 2008, the department notified all HDM providers of the new standards by sending a letter to each provider with a packet of documents including the new standards. The packet also included a new provider enrollment form. The department advised the recipients of the packet that each provider was required to complete the new provider enrollment form to continue receiving reimbursement for delivering HDM meals after January 31, 2009. The department stated that, after that date, providers who had not completed a new provider enrollment form and agreed to the new terms would no longer be eligible to participate in the program. It also stated that, "[b]y signing the provider enrollment form, providers agree to meet the * * * general provider standards as well as the attached Nutrition Program Standards. * * * Compliance is mandatory for payment."

The new provider enrollment form consisted of a single page, which included areas for providers to fill in current business and contact information, as well as a signature line. Immediately below the signature line, the form stated: "The Home Delivered Meal provider must comply with * * * the Medicaid Nutrition Standards published at

http://www.dhs.state.or.us/spd/tools/cm/hdm/standards.pdf
when providing Home Delivered Meals paid for by Medicaid.
Compliance is mandatory for payment."

On November 21, 2008, Homestyle's owner, completed
and signed the new provider enrollment form and returned the
form to the department. Following that, however, Homestyle
continued to prepare frozen meals for home delivery once
or twice each month to Oregon Medicaid clients. It did not
submit a written request to the department for permission
to deliver meals less frequently than the HDM standards
required. Homestyle also continued to have its frozen meals
delivered by UPS package delivery service, whose drivers
did not check the temperature of the food inside the delivered
packages.

In April 2009, the Department of Human Services
determined that Homestyle was not complying with the new
HDM standards because, among other things, it had failed
to provide hot meals, failed to provide meals at least five
days each week without first seeking authorization to do so,
and failed to perform temperature checks on delivered food.
DHS issued a notice to Homestyle that it intended to revoke
Homestyle's provider number, ending its right to receive reim-
bursement. Homestyle requested a contested case hearing
as provided in OAR 410-120-1260(16).

At the hearing, Homestyle did not dispute that it had
failed to meet the HDM standards as DHS had contended.
Instead, it asserted that those standards were unenforceable
because they amounted to unpromulgated administrative
rules. In the alternative, Homestyle asserted that it had
not breached the provider agreement because the provider
agreement did not amount to a contract in the first place.
According to Homestyle, the agreement amounted to an
unlawful contract of adhesion and, in any event, lacked con-
sideration.

In response, DHS first asserted that whether it could
have promulgated the HDM standards as formal administrative
rules was irrelevant, because, under this court's decision in
*Coats*, the standards were enforceable terms of a contract
that Homestyle freely agreed to meet. DHS further asserted

that the provider agreement is an enforceable contract, secured by the consideration of reimbursement for delivery services performed.

The administrative law judge (ALJ) held in favor of DHS. The ALJ first concluded that the HDM standards were enforceable as contract terms, whether or not they also could have been promulgated as administrative rules:

> "*** I find no authority that prevents an agency from including terms in a contract that can be construed as unpromulgated rules. While the new HDM standards do meet the statutory definition of rules, because the Department is attempting to enforce the standards as contractual terms in this matter I do not address their validity as rules under the [Administrative Procedures Act]."

The ALJ further concluded that the provider agreement constituted an enforceable contract, which Homestyle had breached in each of the particulars that DHS had asserted.

DHS issued a final order adopting the ALJ's decision and order and revoking Homestyle's provider number.

Homestyle sought judicial review of that final order in the Court of Appeals, which reversed. *Homestyle Direct, LLC v. DHS*, 245 Or App 598, 600, 263 P3d 1118 (2011). The court concluded that the HDM standards amounted to unenforceable, unpromulgated administrative rules. DHS, the court explained, "cannot enforce its own unpromulgated standards by putting them in the provider agreement and then enforcing the rule that allows sanctions for noncompliance with that agreement. In substance, if not in form, that is an attempt to enforce an invalid rule." *Id.* at 605. The court acknowledged that this court's decision in *Coats* could be read to support DHS's position. *Id.* at 604. Nevertheless, the court concluded that *Coats* was distinguishable, for reasons that we detail below. Having determined that the HDM standards were unenforceable, the court did not address Homestyle's argument that the provider agreement was not an enforceable contract.

DHS sought review in this court. In the meantime, in response to the decision of the Court of Appeals, DHS

adopted a temporary administrative rule that incorporated the HDM standards. It then notified this court that its adoption of the temporary rule might render the case moot. In light of that information, this court asked the parties to address a series of questions related to justiciability. In response, DHS noted that the temporary rule was set to expire on June 13, 2012, and that it did not intend to promulgate a permanent rule to replace it. The temporary rule has since expired, and DHS has not promulgated a permanent rule adopting the HDM standards.

## II.   ANALYSIS

### A.   *Mootness*

We begin, as we must, with the issue of justiciability. This court has explained that the judicial power granted to the courts under Article VII (Amended) of the Oregon Constitution is "limited to the adjudication of an existing controversy." *Yancy v. Shatzer*, 337 Or 345, 362, 97 P3d 1161 (2004). Consequently, Oregon courts "have no authority to decide moot cases." *State v. Hemenway*, 353 Or 498, 500, 302 P3d 413 (2013). A justiciable, nonmoot case is one in which "the parties to the controversy * * * have adverse legal interests and the court's decision in the matter [will] have some practical effect on the rights of the parties." *State v. Snyder*, 337 Or 410, 418, 97 P3d 1181 (2004).

In this case, the parties contend that, notwithstanding the temporary adoption of temporary rules, the matter remains justiciable at this point. We agree. There is no question that the parties have adverse interests; both DHS and Homestyle have vigorously and ably advocated their opposing viewpoints. There is also no question that this court could grant effective relief to the parties. If we agree with the department, then its revocation of Homestyle's provider number will stand, and it will not be required to promulgate its HDM standards as administrative rules to enforce them against providers in the HDM program. Conversely, if we agree with Homestyle, then the department's order will be vacated.

An interesting question arises whether the matter was justiciable during the time that the temporary rules

were in effect. We need not address that question in this case, however, because those temporary rules have expired.

## B.  *Merits*

On review, the parties essentially reprise the arguments that they have made in previous stages of this contested case proceeding. Homestyle contends that the HDM standards are unenforceable, unpromulgated rules, as the Court of Appeals held, and that, in any event, the provider agreement did not constitute an enforceable contract. DHS, on the other hand, contends that the Court of Appeals erred in failing to apply this court's decision in *Coats* and in concluding that it may not enforce the HDM standards as contract terms.

### 1.  *Whether the Provider Agreement Is an Enforceable Contract*

We begin with the question whether the provider agreement is an enforceable contract in the first place. If it is not, then that obviates the need to address whether the HDM standards are enforceable as contract terms.

Homestyle begins by arguing that the 2008 provider agreement was not an enforceable contract. According to Homestyle, the form is simply "an administrative form designed to collect necessary information regarding providers" and is not subject to the public contracting requirements of the state public contracting law.

To begin with, it is not clear that Homestyle preserved that particular contention. Before the ALJ and the Court of Appeals, Homestyle argued that the provider agreement was not an enforceable contract for two reasons—first, because it amounted to an unlawful contract of adhesion (an argument that it does not advance before this court), and second, because it lacked consideration. There was no mention of the argument that it now asserts, based on the nature of the provider agreement form itself.

At all events, the argument is unavailing. Even assuming for the sake of argument that Homestyle is correct

that the form was designed to collect necessary information from providers, it cannot be contested that the form also unambiguously states that "[t]he Home Delivered Meal provider must comply with *** the [HDM] standards" and that "[c]ompliance is mandatory for payment." Moreover, the rules that require provider agreements state that the signed form "constitutes agreement *** to comply with all applicable *** Provider rules and federal and state laws and regulations." OAR 410-120-1260(2). Thus, whatever additional purposes the form may serve, it is clear that it constitutes an enforceable agreement.

In the alternative, Homestyle argues that the purported agreement fails for want of consideration. In Homestyle's view, since 2005, it had operated under a provider agreement, the terms of which the department attempted to alter in 2008 by simply substituting new HDM standards. The new standards, Homestyle argues, amounted to an attempted modification of the existing contract, which requires new consideration. DHS argues, and the ALJ concluded, that the department terminated the 2005 provider agreement in 2008 and then offered providers a new agreement with new terms fully supported by the consideration of reimbursement in exchange for agreement to comply with its terms. We agree with DHS.

The formation of a contract requires a "bargain in which there is a manifestation of mutual assent to the exchange and a consideration." *Restatement (Second) of Contracts* § 17(1) (1981). Mutual assent, historically referred to as the "meeting of the minds," may be expressed in words or inferred from the actions of the parties. *Bennett v. Farmers Ins. Co.*, 332 Or 138, 148, 26 P3d 785 (2001). Consideration is defined as "some right, interest, profit or benefit or some forbearance, deteriment, loss or responsibility given, suffered or undertaken by the other." *Shelley v. Portland Tug & Barge Co.*, 158 Or 377, 387, 76 P2d 477 (1938).

In this case, as we have described, in November 2008, DHS notified its providers that they would no longer be eligible for Medicaid reimbursement for home delivery of meals after January 31, 2009; the existing provider agreements, in other words, were terminated. There is no suggestion that

DHS lacked authority to do that. DHS then extended an offer to enter into a new provider agreement. It included in the information packet that it sent to all providers a new provider enrollment application, which incorporated the new HDM standards and expressly stated that participation in the reimbursement program was conditioned on agreement to comply with those standards. Homestyle completed that new provider enrollment application, signed it, and returned it to DHS. The parties thus manifested the required mutual assent and satisfied the requisite element of consideration when DHS offered to provide reimbursement in exchange for Homestyle's agreement to provide meals under the HDM program and comply with the HDM standards, and Homestyle accepted that offer by signing and returning the new provider enrollment application, which expressly stated those terms.

2. *Whether the HDM Standards Are Enforceable as Contract Terms*

We turn, then, to the issue of the enforceability of the HDM standards. Because the arguments of both parties, as well as the reasoning of the Court of Appeals, largely turn on the applicability of this court's opinion in *Coats*, we begin with a review of that case.

The plaintiff in *Coats* was a contractor who constructed and repaired highways in Oregon. 334 Or at 589. The plaintiff contracted with the Oregon Department of Transportation to pave a portion of a state highway. The contract required the plaintiff to pay its workers in accordance with wage and hour rules that had been adopted by the Oregon Bureau of Labor and Industries (BOLI). *Id*. at 590. The plaintiff did not comply with those rules. As a result, ODOT withheld payment under the contract. *Id*. at 591.

The plaintiff responded by bringing an action against ODOT for breach of contract in circuit court, alleging that the BOLI wage and hour rules were invalid because they were predicated on a misinterpretation of the applicable wage and hour statutes. *Id*. at 591-92. ODOT counterclaimed for breach of contract, and both parties moved for summary judgment. *Id*. at 592.

The plaintiff argued that ODOT could not lawfully bind him to comply with invalid BOLI wage and hour rules. ODOT responded that, among other things, even if the BOLI rules were invalid, the plaintiff was bound to comply with them as terms of his highway contract. *Id*. at 593. The trial court granted the plaintiff's motion, denied ODOT's motion, and entered judgment accordingly. *Id*. The Court of Appeals affirmed, agreeing with the plaintiff that the BOLI wage and hour rules were invalid, at least as applied to the plaintiff, because that application was at odds with relevant wage and hour statutes. *Coats v. ODOT*, 170 Or App 32, 40-41, 11 P3d 258 (2000).

This court reversed, holding that the lower courts lacked subject matter jurisdiction to address the validity of BOLI's administrative rule. The court explained that, as a general rule, one who seeks to challenge the validity of an administrative rule must do so in accordance with the rule-challenge provisions of the APA. 334 Or at 595. The plaintiff had not done that. The court noted, however, that an earlier decision—*Hay v. Dept. of Transportation*, 301 Or 129, 719 P2d 860 (1986)—had recognized an exception to that general rule: The validity of a rule may be challenged in a civil action if validity is properly "'at issue.'" *Coats*, 334 Or at 596 (quoting *Hay*, 301 Or at 138). The plaintiff in *Coats* invoked that exception, arguing that his breach of contract claim placed the validity of BOLI's rules "at issue." *Id*.

The court rejected that argument, concluding that the validity of BOLI's rules was simply "not relevant." *Id*. at 597. Even if the rules could not be enforced against the plaintiff as rules, the court explained, they could still be enforced against him as contract terms:

> "Plaintiff * * * seeks to challenge the validity of state agency rules that, earlier, he had agreed to as contract terms. Even if plaintiff could not be forced to comply with those rules by operation of law, he nonetheless could bind himself to do so by contract, as he did here. Instead, the only relevant question is whether BOLI's rules are applicable to plaintiff *as contract terms*. The validity of BOLI's rules, therefore, is not relevant to, or 'at issue' in, plaintiff's breach of contract action."

*Id*. (emphasis in original; citations and footnotes omitted).

*Coats* squarely controls this dispute. As in *Coats*, this case involves what is essentially a breach of contract action: DHS terminated Homestyle's provider number because of "[b]reaches of [the p]rovider agreement." OAR 410-120-1260 (15)(b)(A). As in *Coats*, even assuming that Homestyle could not be forced to comply with the HDM standards by operation of law—that is, as rules—it nonetheless could bind itself to do so by contract, as it did here. Accordingly, as in *Coats*, the only relevant question is whether the HDM standards are applicable to Homestyle *as contract terms*. It necessarily follows that, as in *Coats*, the validity of the HDM standards, as rules, is irrelevant.

As we have noted, the Court of Appeals, while acknowledging that "broad language" in *Coats* supports the notion that the validity of the HDM standards as rules is irrelevant, nevertheless concluded that the decision was distinguishable. The court identified four rationales for that conclusion. With respect, however, we find none of those rationales to be persuasive.

First, the Court of Appeals noted that the BOLI rules were invalid for a different reason from the invalid HDM standards at issue in this case. According to the court, "there is a difference between a rule that may be invalid because it results from an agency's misinterpretation of a statute, the situation in *Coats*, and a rule that is invalid because it was never promulgated." *Homestyle*, 245 Or App at 604. In the view of the Court of Appeals, DHS's failure to promulgate the HDM standards as rules implicated "one of the basic precepts of administrative law: A rule that can be brought to bear so as to impose serious disabilities on citizens must, at the least, be subjected to some level of public scrutiny before it goes into effect." *Id*. (footnote omitted).

At the outset, we note that the court's rationale proceeds from a mistaken premise. The court is not quite correct in asserting that, before any rule can go into effect, it must be subject to public scrutiny. Merely because a given administrative standard or policy satisfies the statutory definition of a "rule" under the Administrative Procures Act (APA) does not necessarily mean that it is invalid unless preceded

by notice and comment rulemaking proceedings. Most public contracts, for example, are exempt from rulemaking procedures, even if they contain terms that otherwise qualify as "rules." *See* ORS 183.335(10). In addition, the APA provides that agencies are authorized to adopt general policies that otherwise would qualify as "rules" during contested case proceedings, without going through notice-and-comment rulemaking. *See* ORS 183.355(5) ("[I]f an agency, in disposing of a contested case, announces in its decision the adoption of a general policy applicable to such case and subsequent cases of like nature, the agency may rely upon such decision in disposition of later cases."). Whether an agency is required to adopt a policy that qualifies as a "rule" *solely* by means of rulemaking procedures depends on whether the legislature has declared that rulemaking is the sole acceptable means of adopting the particular policy at issue. *See, e.g.*, *Forelaws on Board v. Energy Fac. Siting Council*, 306 Or 205, 214, 760 P2d 212 (1988) ("If an agency is required to adopt a rule through rulemaking proceedings, that requirement must be found through analysis of the specific statutory scheme under which an agency operates and the nature of the rule that the agency wishes to adopt."); *Trebesch v. Employment Division*, 300 Or 264, 267, 710 P2d 136 (1985) (Whether an agency is required to engage in rulemaking may not be "divined from the administrative procedures act;" rather, "[t]he authorizing statutes will specify whether rulemaking or adjudication authority, or both, are delegated to the agency and will indicate the agency's tasks, the breadth of the agency's discretion to carry out these tasks, and the process by which they are to be accomplished.").

Aside from that, the notion that the reason for the invalidity of the rule makes a difference cannot be reconciled with the stated rationale of *Coats*. This court explained that whether the BOLI rules were invalid was irrelevant because the parties had bound themselves to comply with the same obligations *by contract*. Because the obligations were separately enforceable by contract, the reason for the possible invalidity of the same obligation as an administrative rule simply did not matter.

Second, the Court of Appeals suggested that the HDM standards at issue in this case are "significantly more burdensome" than the allegedly invalid rule in *Coats*. 245 Or App at 604. The relative burden that those rules imposed, however, was not mentioned as a relevant consideration in *Coats*, and we do not understand how it would be relevant to *Coats*'s stated rationale, which was that parties are bound to comply with obligations that they agree to comply with by contract, regardless of whether they might also be bound to comply for other reasons.

Third, the Court of Appeals differentiated between the focus of the breach of contract action in *Coats* and the focus of this action, which the court characterized as a "rule challenge as part of the defense to an agency action to enforce a rule." *Id*. The court stated that, in a breach of contract action, the focus is on "whether the parties to the contract have honored the mutual obligations that they have undertaken." *Id*. The court observed that, "[i]n a rule challenge that is a part of the defense to an agency action to enforce a rule, * * * the focus is on whether the agency's rule is within its authority, and the fact that the rule has been rebranded as a contract term does not alter that basic fact." *Id*.

Again, the court's reasoning proceeds from a mistaken premise, which is that DHS has merely "rebranded" the HDM standards as contract terms. The fact is that they *were* contract terms. Aside from that, it is not clear to us that the action in this case is properly characterized as a "rule enforcement" proceeding. The assumption that it is a rule enforcement proceeding appears to beg the question whether it is an administrative rule or a contract term that is at issue in the first place. Moreover, contrary to the characterization of the Court of Appeals, Homestyle has not asserted a rule challenge as a defense to an agency action to enforce a rule. DHS did not initiate this action to enforce any administrative rule. Homestyle initiated the contested case proceeding to challenge DHS's revocation of Homestyle's provider number because of its "[b]reach of [the] [p]rovider agreement."

Fourth, and relatedly, the Court of Appeals compared the relatively attenuated connection between the invalidity of the BOLI rules and the breach of contract action in *Coats* with the more direct connection between the invalidity of the HDM standards and the DHS action in this case. "In an agency action to enforce a contract term that is itself an invalid rule," the court reasoned, "the connection is direct." *Id.* at 597 (emphasis omitted).

Once again, the Court of Appeals assumed that DHS initiated this action to enforce an administrative rule, which is incorrect. Moreover, even assuming that this is, as the court characterized it, "an agency action to enforce a contract term that is itself an invalid rule," the fact remains that, under *Coats*, the validity or invalidity of a rule as a rule is irrelevant if the agency seeks to enforce the obligation as a contract term.

Homestyle offers its own rationale for distinguishing *Coats*. According to Homestyle, *Coats* "should be viewed as an aberration" and should be narrowly confined to its facts. In particular, Homestyle emphasizes that the contract in *Coats* was a "bilateral bargained-for-exchange contract," while the contract at issue in this case "can, at best, be described as a series of unilateral contracts." In support of that proposition, Homestyle cites this court's opinion in *Pharmaceutical Ass'n v. Welfare Com.*, 248 Or 60, 432 P2d 296 (1967). The distinction is important, Homestyle explains, because, in a unilateral contract such as this one, "the state agency enjoys an unequal bargaining position." In Homestyle's view, that unequal bargaining position leaves contracting parties with no recourse but the rulemaking safeguards of the APA, should they wish to contest particular terms of the agreement.

Homestyle's argument, too, is predicated on a mistaken premise, namely, that the agreement in this case is a unilateral contract. A unilateral contract is one in which one party makes a promise in return for consideration other than a promise. *Restatement (Second) of Contracts* § 45 (1981). *Pharmaceutical Ass'n* provides an example. In that case, the State Public Welfare Commission simply offered to reimburse any pharmacist that provided prescription drugs to eligible recipients of public assistance for stipulated prices

published in a "Drug Guide"; the Commission required no promise or commitment in advance. 248 Or at 64-65. As the court explained:

> "We think it is clear that \*\*\* we are dealing here with a unilateral contract, or, to be more exact, a series of such contracts. The Commission, through the Drug Guide, made a continuing offer to the druggists to pay them stipulated prices for drugs dispensed to eligible recipients of public assistance and each and every such transaction carried out by the druggists in accordance with the regulations in the Drug Guide constituted acceptance of the offer and an executed contract supported by valuable consideration."

*Id.* at 67.

This is not such a case. The provider agreement at issue in this case expressly consisted of a one promise in exchange for another: DHS agreed to provide Medicaid reimbursement in exchange for Homestyle's agreement to comply with, among other things, the HDM standards in delivering meals to recipients. Thus, the agreement in this case is not a unilateral contract of the sort at issue in *Pharmaceutical Ass'n*. It is, instead, the same sort of bilateral contract that was at issue in *Coats*.

Finally, Homestyle argues that *Coats* is distinguishable because the contracting party in that case "was apparently aware of ODOT's interpretation of the contested rule before entering into the contract," while in this case, "Homestyle did not have actual knowledge of the new standards until receiving a letter indicating that they were in violation of the standards." According to Homestyle, "[t]o the extent that *Coats* provides a judicially created exception to the general statutory rulemaking requirements, its holding should be limited" to cases in which the contracting parties had notice of the terms an agency seeks to enforce by contract.

Once again, Homestyle appears to be advancing an argument for the first time on review; we have searched the record in vain for any such argument made to the ALJ or to the Court of Appeals. In any event, the argument fails. As we have noted, it is undisputed that DHS notified all HDM providers of the new standards in November 2008, a full

two months before the new standards were scheduled to go into effect. The notification included a packet of information that contained a copy of the new standards, a new provider enrollment form, and a cover letter explaining the new rules, declaring that, "[b]y signing the provider enrollment form, providers agree to meet the *** [HDM] standards," and warning that "[c]ompliance is mandatory for payment." It is further undisputed that Homestyle received that packet of information and that its owner signed and returned the new provider enrollment form. We reject Homestyle's final argument without further discussion.

In sum, we conclude that department's final order correctly determined both that the 2008 provider agreement was an enforceable contract and that the HDM standards with which the agreement required compliance were enforceable as terms of that agreement. The Court of Appeals erred in concluding that those standards were unenforceable because they were unpromulgated administrative rules.

The decision of the Court of Appeals is reversed. The final order of the Department of Human Services is affirmed.